IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ALONZO ELMER JACKSON,

                    Petitioner,

vs.

GARY SANDOR, Warden,

                    Respondent.

Case No. 2:09-cv-02497-JKS

<u>MEMORANDUM DECISION</u>

    Petitioner, Alonzo Elmer Jackson, a state petitioner proceeding *pro se*, has filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254.  Jackson is currently in the custody of the California Department of Corrections, incarcerated at the Ironwood State Prison, in Blythe, California.  Respondent has filed an answer, and Jackson has filed a traverse.

<u>Statement of the Facts</u>

    Jackson was charged with the sexual assault of two women, J.O. and O.T.  The following statement of the facts was taken verbatim from the decision of the California Court of Appeal, Third District:[1]

---

[1] *People v. Jackson*, 77 Cal.Rptr.3d. 474 (Cal. App. 2008).  Under the Antiterrorism and Effective Death Penalty Act of 1996, the determination of these facts is presumed to be correct, and Jackson has the burden of rebutting that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The Sexual Assault of J.O.

In January 2002, J.O. was 18 years old and a participant in a training program with the Job Corps, living on the Job Corps campus in Sacramento. On January 20, 2002, she and another Job Corps participant, M.M., rode a Job Corps shuttle bus to the Florin Mall. After going to the mall, M.M. bought some type of strong alcohol, which both women drank before going back to the shuttle bus stop at around 8:00 p.m. The shuttle was running late.

While the women were waiting, a man drove up in a white Dodge Neon. M.M. approached the man and they spoke briefly. M.M. told J.O. the man said he was looking for his niece who was in the Job Corps program and he offered to give them a ride back to the Job Corps campus. The women accepted his offer. M.M. got into the front passenger seat and J.O. got into the back seat.

M.M. and the man flirted and conversed while J.O. looked out the window. M.M. suggested J.O. massage the man's shoulders and J.O. did so, although she felt uncomfortable. J.O. heard M.M. say something about spending the night with the man for money, but J.O. thought M.M. was joking. The man said he knew where there was a party and there was some discussion about going to it. J.O. told M.M. they should go back to the Job Corps.

After driving a couple of miles, the man pulled over on a residential street because M.M. said she needed to urinate. M.M. got out of the car and went over to a bush. The man climbed into the back seat of the car with J.O. He started to flirt with her and was "trying to feel [her] up[.]" J.O. kept asking where M.M. was and said they needed to get back to the Job Corps. The man got back into the driver's seat, reached over, pulled the door closed, and drove off. When J.O. asked him what he was doing, the man replied that he was going to rape her as it had always been a fantasy of his. He said he had a gun and gestured next to him, although J.O. did not see any weapon.

The man drove to a darker area where he stopped and moved quickly into the back seat. The man forcibly pushed J.O. down, got her pants off, licked her neck, and fondled her breasts and vagina. He put a condom on and put his penis inside her vagina for about two minutes. Afterwards the man handed J.O. a shirt and said something about washing the car windows. J.O. got out of the car and started running away. The man drove away. J.O. walked to a commercial street, found a pay phone and called Job Corps, telling the Job Corps' security officer she had just been raped.

Job Corps officials brought J.O. back to campus and called law enforcement. Sacramento Sheriff deputies arrived and took a statement from J.O., including a description of the rapist. J.O. drove with the officers to the area of the rape, but she could not find the location exactly. The officers took her to the hospital where she underwent a sexual assault medical exam.

The nurse practitioner at the hospital noticed bruising on J.O.'s neck and a small microscopic tear at the entry of her vaginal opening, injuries which were consistent with rape. The nurse collected blood, urine and hair samples from J.O. She took several swabs from J.O.'s body, including one from her neck where saliva might have been left by the rapist. The samples taken from J.O. were preserved and screened by a criminalist with the biology unit of the Sacramento County District Attorney's Laboratory of Forensic

2

Services. Subsequent analysis of J.O.'s urine tested positive for chemicals associated with the drug Ecstasy, although J.O. denied she had ever taken Ecstasy that night or any prior night.

In June 2004, the Sacramento Sheriff's Department was notified a "cold hit" from the state's DNA database identified defendant as a suspect in J.O.'s case. At trial, reference to the cold hit was not allowed and Sheriff Detective Christopher Joachim testified before the jury that an "investigative lead" was received. Based on that information, Joachim compiled a photo lineup and met with J.O.  J.O. identified defendant's photo as the most likely to be the rapist. She told Joachim she was pretty sure it was him. He had the right look, which she described as a dopey or sad look. J.O. identified defendant in court as the man who raped her.

*318 Joachim determined defendant's address and found a white Dodge Neon belonging to defendant parked by the apartment. Defendant was arrested the next day at his place of employment, the Good Guys store located on Florin Road. Joachim took four buccal swabs from defendant's cheek, mouth and gums for DNA analysis pursuant to an authorizing court order. When shown defendant's car, J.O. identified the Dodge Neon as identical to the car in which she was raped. A package of condoms was found in the trunk, as well as two bottles of lotion.

<u>The DNA</u>

A criminalist expert in DNA extraction and analysis testified the neck swab taken from J.O. contained a mixture of DNA from two persons. The major contributor had a DNA profile that matched defendant's DNA profile at all 16 genetic markers that were tested. The minor contributor's profile was consistent with J.O.'s profile. The expert testified the major contributor's profile would be expected to occur randomly among unrelated individuals in one in 400 quintillion of the African–American population, one in 23 sextillion of the Caucasian population and one in 6 sextillion of the Hispanic population. Defendant is African–American.

<u>The Sexual Assault of O.T.</u>

On February 18, 2002, O.T. and her boyfriend, J.B., walked to a bus stop at 47th Street and Stockton Boulevard in Sacramento. J.B. left when a bus pulled up. When it turned out to be the wrong bus, O.T. was left waiting by herself. A man drove up and asked O.T. if she wanted a ride home. O.T. thought he looked familiar and the man acted like he knew her too. O.T. decided to go with him and got into the front passenger seat. O.T. gave the man directions to her mother's house.

The man initially drove towards O.T.'s mother's house, but then made a couple of turns unfamiliar to O.T. He told O.T. he was taking a shortcut. A short time later, he started to touch O.T., rubbing her breast and neck. O.T. brushed him away and told him she had a boyfriend. The man then stopped the car. O.T. tried to get out, but he grabbed her, locked the doors, and got on top of her. O.T. was unable to push him off.

The man kissed O.T.'s breast, neck and back. He inserted his fingers inside her vagina and tried to put his finger in her anus, but O.T. squirmed away. The man grabbed her hand and put it on his penis. O.T. pulled her arm away. The man then put his penis inside her vagina. O.T. was not sure if he ejaculated. He was not wearing a condom. Afterwards O.T. tried to put her clothes back on. The man drove to another location,

3

stopped, and told her to get out. O.T. got out of the car. The man sped off before she could retrieve her sweatshirt.

O.T. went to a nearby phone booth and called the police. When they arrived, she gave them a description of the rapist and his car. Police searching for the rapist found O.T.'s sweatshirt in the road at the intersection of Emerson and Fruitridge Road.

O.T. was taken to the hospital where she was given a sexual assault medical exam. O.T. told the examining nurse practitioner that the rapist had put body lotion on his hand, chest, and penis. O.T. said the man had ejaculated on her thigh and she had wiped it off with a towel. The nurse detected suspected semen on O.T.'s chest, abdomen, and thigh. She collected samples from those areas. She also swabbed O.T.'s breast area for possible saliva as O.T. indicated the rapist's mouth had made contact there. The evidence collected from the sexual assault medical exam was preserved and inventoried at the Sacramento County District Attorney's Laboratory of Forensic Services. Subsequent testing of O.T.'s blood and urine samples detected the presence of marijuana consistent with use of the drug sometime in the previous day.

In February 2005, law enforcement received an "investigative lead" focusing attention on defendant as a suspect in O.T.'s rape case. Sacramento Police Detective Jimmy Vigon contacted O.T. and met with her on March 8, 2005 to show her a photo lineup. O.T. very quickly pointed to defendant's photograph and said, "That's him." Vigon went to the Sacramento County jail two days later and arrested defendant on additional charges involving O.T.  O.T. identified defendant at trial as the man who raped her.

<u>The DNA</u>

The prosecution's criminalist expert in DNA extraction and analysis testified she was able to develop a DNA profile from the samples collected from O.T.'s chest and thigh. The sperm portion of the chest sample came from a single source with a DNA profile that matched defendant's DNA profile at each of 16 genetic markers. The non-sperm portion of the chest sample was a mixture of at least three people. The expert determined the DNA profiles in the non-sperm mixture were consistent with the profiles for O.T., her boyfriend J.B., and defendant. The swab from O.T.'s thigh also contained a slight mixture; the major contributor was consistent with defendant's DNA profile and the minor contributor was consistent with O.T.'s profile. The expert gave the same random match probability for the samples matching defendant's DNA profile as he gave before in J.O.'s rape case.

It was stipulated in front of the jury at trial, that on September 20, 1989, defendant was convicted of felony assault with intent to commit rape in violation of section 220.

Procedural History

On July 10, 2006, the Sacramento County District Attorney filed an amended information

charging Jackson with nine sex-crimes, involving two victims–J.O. and O.T.  As to J.O.:

kidnapping to commit rape–count 1; forcible rape–count 2; sexual battery–counts 3 and 4; and,

attempted penetration of the anus–count 5.  As to O.T.:  kidnapping to commit rape–count 6;

forcible rape–count 7; digital penetration of the vagina–count 8; and sexual battery–count 9.

The information further alleged that Jackson kidnapped his victims and that he

committed offenses against more than one person within the meaning of California Penal Code

§§ 667.61(e)(1) and (e)(5).  The information also alleged that Jackson had been previously

convicted of two serious felony offenses for purposes of  Cal. Penal Code § 667(b)-(i)) and a

third prior felony within the meaning of another repeat offender statute–Cal. Penal Code §

667(a)).  Jackson pled not guilty to all the charges and denied the allegations.

On August 8, 2006, a jury found Jackson guilty of all counts, except for count five of

which they found him not guilty.  The jury also found that Jackson had kidnapped his victims

and that he committed offenses against multiple victims.  The jury also found true all of the

alleged prior-conviction allegations.

The trial court sentenced Jackson to an indeterminate term of 160 years to life on counts

two and seven, and concurrent, indeterminate terms of 30 years to life on each of counts three,

four, eight and nine.  Jackson was also sentenced to two terms of twenty-five years to life on

counts one and six, but these sentences were stayed by the court under California Penal Code

§ 654.

Jackson appealed his conviction and on May 27, 2008, the California Court of Appeal, Third District, affirmed the judgment in a partially published opinion.  On June 5, 2008, the Court of Appeal entered an order modifying the opinion without affecting the judgment.  On June 30, 2008, Jackson filed a petition for review in the California Supreme Court which was denied on September 10, 2008.

On September 9, 2009, Jackson timely filed his Petition for Habeas Corpus in this Court. In his Petition, Jackson raises three grounds for relief:  1) the involuntary collection of his DNA while he was a prisoner at the California Men's Colony in 1993 violated the Fourth Amendment when it was used to identify him in these proceedings; 2) the prosecutor improperly excluded minority jurors on the basis of their race; and 3) the prosecutor committed two instances of prosecutorial misconduct.  Respondent concedes that all of Jackson's grounds for relief are properly exhausted and does not claim that any of the grounds are procedurally barred.

## I.  1993 DNA Collection

In his first ground, Jackson claims that his Fourth Amendment Right against unreasonable searches and seizures was violated by the involuntary collection of a blood sample taken on January 27, 1993, while he was an inmate at the California Men's Colony in San Luis Obispo.[2]  The sample was entered into California's DNA Databank and later used to identify him as the perpetrator of the crimes against J.O. and O.T.

---

[2]  California Penal Code § 296 provides that any person, including any juvenile, who is convicted of or pleads guilty or no contest to any felony offense shall provide buccal swab samples, right thumbprints, and a full palm print impression of each hand, and any blood specimens or other biological samples required for law enforcement identification analysis.

Jackson's Fourth Amendment argument is foreclosed by the Supreme Court decision in *Stone*.[3]  Under the holding in *Stone*, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," federal habeas corpus relief will not lie for a claim that evidence recovered through an illegal search or seizure was introduced at trial.[4]  The Ninth Circuit has made it clear that all *Stone* requires is that the State provide a state prisoner a fair and full opportunity to litigate his Fourth Amendment claim.[5]  "The relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even whether the claim was correctly decided."[6]  In this case, Jackson was provided a fair and full opportunity to present his claims.  He raised the issue in a suppression motion, the trial judge held a hearing on the issue at which Jackson was allowed to present evidence and examine witnesses, and the trial court made a factual finding.[7]

Even if Jackson's claim were not foreclosed by *Stone*, he would still not be entitled to relief.  The Ninth Circuit has repeatedly held that such compulsory blood extractions from convicted felons do not violate the Fourth Amendment.[8]  In the absence of a Supreme Court

---

[3]  *Stone v. Powell*, 428 U.S. 465 (1976).

[4]  *Id.* at 482.

[5]  *See Moormann v. Schriro*, 426 F.3d 1044, 1053 (9th Cir. 2005).

[6]  *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).

[7]  *Moorman*, 426 F.3d at 1053.

[8]  *Hamilton v. Brown*, 630 F.3d 889, 894 (9th Cir. 2011); *United States v. Kincade*, 379 F.3d 813, 836-39 (9th Cir. 2004) (en banc); *United States v. Kriesel*, 508 F.3d 941, 946 (9th Cir. 2007) (concluding that the federal DNA Act, as amended in 2004 to expand the qualifying offenses to all felonies, did not violate the Fourth Amendment); *United States v. Hugs*, 384 F.3d 762, 769 (9th Cir. 2004) ("A condition of supervised release requiring a qualified felon to provide a DNA sample pursuant to the procedures set forth in the DNA Act, 42 U.S.C. § 14135a,

decision to the contrary, Jackson is not entitled to relief on this claim, even if it were cognizable by this Court.

## II.  Batson Challenges

Jackson claims that the prosecutor improperly used her peremptory challenges to exclude certain jurors on the basis of their race.  He argues that the prosecutor's reasons for exercising peremptory challenges against two African-American prospective jurors, M.K. and G.A., were pretextual and that the trial court improperly concluded that the prosecutor was not discriminating on the basis of race.

The Equal Protection Clause prohibits purposeful racial discrimination in the selection of the venire.[9]  In *Batson*, the Supreme Court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause:  1) A defendant raising a *Batson* claim must establish a *prima facie* case of discrimination; 2) once a *prima facie* case of discrimination is established, the burden of offering race-neutral reasons for the strikes shifts to the prosecutor; and 3) after the prosecutor offers race-neutral reasons, the trial court has the duty to determine if defendant has established purposeful discrimination.[10]  When the record suggests that there is an objective reason to strike a juror, there is an implication that racial bias did not motivate the prosecutor.[11]  The trial court

_____

does not violate the Fourth Amendment." (citing *Kincade* )).

[9]  *Batson v. Kentucky*, 476 U.S. 79, 106 (1986).

[10]  *Paulino v. Harrison*, 542 F.3d 692, 699 (9th Cir. 2008) (citing *Batson*, 476 U.S. at 98).

[11]  *See Paulino v. Castro*, 371 F.3d 1083, 1091-92 (9th Cir. 2004).

may also engage in a comparative analysis between the struck juror and the empaneled jurors in order to determine whether the facially-race-neutral reasons are a pretext for discrimination.[12]

"The trial court has a pivotal role in evaluating *Batson* claims.  Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.'"[13] The Supreme Court has held that on direct appeal, "a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous."[14]  This deference presumably applies equally to a state-court decision based on *People v. Wheeler*, 22 Cal.3d 258, 280 (1978), because it is the procedural equivalent of a federal *Batson* challenge.[15]  In the context of a habeas case, a district court must also grant an additional level of deference to the California Court of Appeal–this Court may only grant relief if the decision of the state court constituted an unreasonable application of *Batson*.  Recently, in *Felkner v. Jackson*,[16] the Supreme Court emphasized the high level of deference due to state-court *Batson* decisions–especially when the state court has "carefully reviewed the record at some length in upholding the trial court's findings.'"[17]

---

[12]  Boyd v. Newland, 467 F.3d 1139, 1148-49.

[13]  *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (internal citations omitted).

[14]  *Id.*

[15]  In California, a *Wheeler* motion is the procedural equivalent of a federal *Batson* challenge.  *See Tolbert v. Page*, 182 F.3d 677, 679 (9th Cir. 1999) (en banc); *People v. Wheeler*, P.2d 748 (Cal. 1978).

[16]  563 U.S. __, 131 S. Ct. 1305 (2011).

[17]  *Id.* at 1307.

9

During the jury selection, Jackson's counsel raised a *Batson/Wheeler* objection, claiming that the prosecutor had improperly excluded two African-American jurors on the basis of their race: M.K. and G.A.  The trial court found the defense had made a *prima facie* showing of discrimination and asked the prosecutor to explain her reasons for excluding M.K. and G.A.  The prosecutor provided racially-neutral reasons for excluding each of the jurors in question and the trial court was satisfied that the prosecutor had not acted improperly.  The California Court of Appeal affirmed this conclusion on direct appeal.

<u>Voir Dire and Exclusion of M.K.</u>

M.K., who is African-American, was removed from the jury on the basis of a preemptive challenge.  When prompted to give a racially-neutral explanation for dismissing M.K. the prosecutor said she excluded M.K. because of her youth, lack of work history and her attitude regarding her cousins' troubles with the law.  The trial court held that this was an acceptable, racially-neutral reason for dismissal.  The California Court of Appeal also rejected Jackson's *Batson* claim, holding:

> Jackson complains here that the trial court improperly upheld the challenge to M.K. based on a reason not given by the prosecutor as her stated basis, that is, on the basis of her having relatives who had involvement with the law, who had committed felonies or were in prison. (*Miller-El v. Dretke* (2005) 545 U.S. 231, 252 [162 L.Ed.2d 196, 221].) In fact, the prosecutor did state that one of her concerns was that M.K. had "family members in prison or charged with felonies[.]" The prosecutor went on to express concern regarding M.K.'s somewhat flippant attitude towards these cousins and their problems with the law. We read the record, however, to reflect both concerns as part of the prosecutor's explanation of the reasons for her challenge. Thus, the trial court did not err in relying on an explanation not proffered by the prosecutor and the reason related was gender and race neutral. (*People v. Lancaster* (2007) 41 Cal.4th 50, 77-78.)
>
> Moreover, the criminal history of M.K.'s family was combined with the primary basis for the prosecutor's challenge to M.K.—her youth and lack of life experience, essentially her immaturity. Although the trial court did not comment on this stated reason, it was not required to do so. "[T]he trial court is not required to make specific

or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*People v. Reynoso* (2003) 31 Cal.4th 903, 919.) Youth and lack of life experience is a valid explanation for a peremptory challenge. (*People v. Sims* (1993) 5 Cal.4th 405, 429-430; *People v. Perez* (1994) 29 Cal.App.4th 1313, 1328; *United States v. Ferguson* (7th Cir. 1991) 935 F.2d 862, 865.)

According to [Jackson], however, a comparative juror analysis shows that M.K.'s youth and lack of experience was a pretext for the prosecutor's challenge. . . . For purposes of this appeal, we will accept [Jackson's] claim that a comparative analysis must be conducted.

[Jackson] claims "the prosecutor's focus on [M.K.]'s youth was clearly a pretext because Redacted Juror No. 2, who remained on the jury unchallenged by the prosecutor, was a student at American River College who had been working at Arco Arena for five months and before that eight months at Safeway." According to [Jackson], there was no appreciable difference between this young juror and M.K. We disagree. Juror No. 2 stated that he was a student at American River College focusing on audio engineering with a long-term goal to work on his own music production team. He had been working in music for 11 years. The fact Juror No. 2 was pursuing a specific college major related to an identified long-term goal in an area that he had been working in for a substantial number of years indicates he had reached a certain level of maturity. It suggested he was capable of making important decisions. In contrast, M.K. stated she was "indecisive" about her long-term goals. She was finishing up her prerequisites for nursing, but had taken a job completed (sic) unrelated to the health field at the DMV. "[A] side-by-side comparison of the prospective jurors in question reveals they were not 'similarly situated.'" (*People v. Lewis and Oliver*, *supra* 39 Cal.4th at p. 1020, quoting *Miller-El v. Dretke*, *supra*, 545 U.S. at p. 247 [162 L.Ed.2d at p. 218].)

[Jackson] finds evidence of the prosecutor's insincerity in her explanation of her challenge to M.K. in "her mention of a similar situation in the 'young gentleman who was having difficulty with the propensity evidence.'" [Jackson] asserts this was a reference to V.C. who was excused for cause because he expressed an inability to be fair to [Jackson] once he heard the evidence of a prior sexual offense, [Jackson's] section 220 conviction. [Jackson] asserts that while both M.K. and V.C. might have similar youth, there was no evidence M.K. would have been unduly influenced by the prior conviction or could not be fair to both sides. The prosecutor did not claim M.K. and V.C. were similar in all respects or that there was a basis to challenge M.K. for cause. She referenced the trial court's comments about V.C.'s youth only as part of her comments that "it is difficult [for] people who are young to make very important decisions, such as we'll be needing in this case." The prosecutor's mention of V.C. does not undercut her explanation of her challenge to M.K.

[Jackson] complains the prosecutor did not question M.K. about her decision making and points us to the prosecutor's later question to the entire jury panel about whether there was anyone who had never had the experience working or making a

11

decision in a small group and whether everybody felt up to that process, to which latter question all the jurors apparently nodded in the affirmative. We believe the prosecutor's lack of individual questioning of M.K. regarding her decision-making ability may be explained by the prosecutor's comment that she felt M.K. was "not on the top level for my jury ranking; possibly acceptable, but given the peremptories that [she] still [had] available, it [was her] preference not to have someone that young." That is, the prosecutor may have passed on further questioning and an early challenge to M.K., but later decided she did not want someone with as little life experience as M.K. Also, it would have been entirely permissible for the prosecutor at that point to evaluate how the then seated prospective jurors would work together on such a serious case and then decide against keeping someone with unproven decision making abilities such as M.K. The prosecutor was not required to accept M.K.'s apparent self-belief in her ability to deliberate and decide the case.[18]

This Court can grant Jackson relief only if this analysis constituted an unreasonable application of *Batson* or involved an unreasonable determination of the facts. The prosecutor stated that she was concerned with M.K.'s youth and lack of work history. She then went on to clarify that she was not focusing on M.K.'s age *per se*, but rather on M.K.'s lack of life experience.[19] The prosecutor also expressed concerns about M.K.'s nonchalant attitude regarding the fact that her cousins had some serious problems relating to the law. Finally, the prosecutor conceded that M.K. was possibly acceptable as a juror but that she (M.K.) was not at the top of her list; given the remaining challenges the prosecutor had, she chose to dismiss M.K.

Contrary to Jackson's contention, a comparative juror analysis does not undermine the prosecutor's proffered reasons. Jackson claims that Juror No. 2 possessed the same, allegedly-undesirable traits: Juror No. 2 was a student at American River College who had been working at Arco Arena for five months and before that eight months at Safeway. Jackson claims that

---

[18]  Lodged Doc. 5, pp. 37-41.

[19]  The prosecutor noted that Juror No. 9 was young, single and did not have children, but he worked as an assistant manager which required him to participate in hiring and firing decisions.

Juror No. 2 was also young and had no significant work history, but was empaneled despite these alleged deficiencies.  However, the Court of Appeal observed that Juror No. 2 had been working in music for 11 years was in the process of pursuing a specific college major which would allow him to achieve a long-term goal which he had set for himself–to work on his own music production team.  This pursuit showed dedication, focus, and the ability to make decisions.  In contrast, M.K was pursuing a nursing degree but was unsure about her long-term goals; she was also working in a field completely unrelated to nursing.  A comparative juror analysis reveals that although Juror No. 2 was young, he had a demonstrated ability to make decisions and work toward goals–a sign of maturity that M.K. appeared to lack.  Furthermore, there is no record that Juror No. 2 had close family members who were in trouble with the law.[20]  The Court of Appeal's determination that a comparative juror analysis did not reveal a racial motivation on the part of the prosecutor did not constitute an unreasonable application of *Batson*.

Voir Dire and Exclusion of G.A.

G.A., who is African-American, was also removed from the jury on the basis of a preemptive challenge.  When prompted to give a racially-neutral explanation for dismissing G.A., the prosecutor said she excluded G.A. because she had an ex-boyfriend, with whom she was still friendly, who had been accused of a sexually assaultive crime; in her opinion he was falsely accused.  The trial court held that this was an acceptable, racially-neutral reason for dismissal.  The California Court of Appeal also rejected Jackson's *Batson* claim, holding:

> With respect to G.A., the trial court stated that "it is a very legitimate reason to exercise peremptory challenge because of the ex-boyfriend, which she is still friends

---

[20]  In her voire dire, M.K. admitted to being close with her cousins, although she did not attend their trials to provide moral support.

with who she believes falsely was accused of a sexual assault." Jackson complains there was no evidence as to how close G.A. remained with her boyfriend, other than they were friends, and whether he had any residual influence on her. The accusation had been in the past when they were already apart. The charges were dismissed and G.A. thought it had been handled appropriately. Jackson compares G.A. to Juror No. 12 who had a sister who was physically and mentally abused by her husband and a "second cousin who was found guilty [of] murder for hire in a lover's triangle kind of issue."

G.A.'s continued friendship with an ex-boyfriend who she believed was falsely accused of sexual assault is a valid gender and race-neutral reason for the prosecutor to exercise a peremptory challenge. (See *People v. Jordan* (2006) 146 Cal.App.4th 232, 258, and cases cited therein.) It was not unreasonable for the prosecutor to be concerned that G.A. might be likely to view the victims' reports of rape in this case with skepticism in light of her ex-boyfriend's case and the victims' credibility issues. She might be sympathetic towards the defense of consent. Juror No. 12's situation was not comparable as it neither involved a sexual offense nor, more importantly, any hint that the charges had been inappropriately charged and prosecuted. We do not agree that the failure to explore how close G.A. remained with her boyfriend or his influence on her tends to show pretext: What the prosecutor already knew was enough for any rational prosecutor to challenge this juror.

We conclude none of the comparisons made by appellate counsel undermine the trial court's findings that the prosecutor's justifications were genuine.[21]

This Court can grant Jackson relief only if this analysis constituted an unreasonable application of *Batson* or involved an unreasonable determination of the facts.  As the Court of Appeal noted, G.A.'s close relationship with an individual who she felt was improperly accused of a sex crime was a perfectly acceptable, race-neutral reason for dismissing her–she might be especially receptive to a defense of consent.  A comparative juror analysis does not undermine the prosecutor's proffered reason.  Jackson claims that Juror No. 12 was similarly situated to G.A. because Juror No. 12 had a sister who was physically and mentally abused by her husband and a second cousin who had been found guilty of murder-for-hire.  Juror No. 12 was related to the *victim* of abuse, not an individual who had been falsely accused of a sexual assault.  Nor was

---

[21]  Lodged Doc. 5, pp. 41-42.

there any implication that the charges filed in that case were improper.  The Court of Appeal's determination that a comparative juror analysis did not reveal a racial motivation on the part of the prosecutor did not constitute an unreasonable application of *Batson*.  Jackson is not entitled to relief on his second claim.

### III.  Prosecutorial Misconduct

In his third ground, Jackson contends that the prosecutor committed misconduct in her cross-examination of him by suggesting that he was a suspect in another case.  Jackson also contends that the prosecutor violated his rights under *Doyle v. Ohio*,[22] by eliciting testimony from Detective Christopher Joachim that he did not provide information during his interview consistent with his trial testimony.  The California Court of Appeal denied both of these claims on direct appeal.

"To warrant habeas relief, prosecutorial misconduct must 'so infect the trial with unfairness as to make the resulting conviction a denial of due process.'"[23]

In determining whether a comment rendered a trial constitutionally unfair, factors [the court] may consider are whether the comment misstated the evidence, whether the judge admonished the jury to disregard the comment, whether the comment was invited by defense counsel in its summation, whether defense counsel had an adequate opportunity to rebut the comment, the prominence of the comment in the context of the entire trial and the weight of the evidence.[24]

---

[22]  426 U.S. 610 (1976).  In *Doyle*, the Court held that once a criminal suspect has invoked his right to remain silent, the prosecutor cannot use this silence to impeach the defendant's subsequent testimony.

[23] *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

[24] *Hein v. Sullivan*, 601 F.3d 897, 912-13 (9th Cir. 2010); *see Darden*, 477 U.S. at 182.

"[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned"[25]–what is required is that reviewing courts consider the equivalent to evaluating whether there was a "reasonable probability" of a different result.[26]

Cross-Examination of Jackson

Jackson testified on his behalf and during the prosecutor's cross-examination, the following exchange took place:

> **Q:** And you agreed to talk to him [Det. Joachim], because you did, you talked to him, right?
> **A:** Yes, we talked.
> **Q:** And Detective Joachim was professional with you, right?
> **A:** Yes.
> **Q:** And he was courteous, correct?
> **A:** Sometimes.
> **Q:** Sometimes. When was he not courteous to you?
> **A:** There were times that I felt he was pressuring me, but most of the times he was
>
> nice.
> **Q:** When did you feel he was pressuring you?
> **A:** When he brought the other officer in, and they were teaming up on me.
> **Q:** He brought another officer in who was teaming up on you. Now that other officer was talking to you about a matter unrelated to this trial today, correct?
> **A:** No.
> **Q:** A different case?
> **A:** No.[27]

Defense counsel objected and requested a mistrial on the ground that the prosecutor had improperly implied that Jackson was a suspect in other rapes and/or kidnappings which were not before the jury.  The trial court agreed that the reference to another, unrelated matter constituted

---

[25] *Darden*, 477 U.S. at 181.

[26] *See Hein*, 601 F.3d at 914-15.

[27] 3 R.T. 850.

prosecutorial misconduct.  However, the court determined that the misconduct was not prejudicial because:  1) In this case, Jackson was being charged with two separate rapes which were investigated by two different detectives; 2) Jackson stipulated to having a prior conviction; 3) Jackson testified he initially thought the police wanted to question him about some traffic matters; and (4) there was evidence that Jackson's vehicle registration was not current.[28]  The court also issued a curative instruction to the jury:

> Ladies and gentlemen of the jury, I want you to disregard the statement by the district attorney regarding the second officer speaking about another matter.  The district attorney did not intend to imply that there are other cases than those before you.[29]

The Court of Appeal agreed that the prosecutor's misstatement was not prejudicial when viewed in context:

> On appeal, Jackson points out that a prosecutor's reference to facts not in evidence is misconduct. (*People v. Pinholster* (1992) 1 Cal.4th 865, 948; *Berger v. United States* (1935) 295 U.S. 78, 88 [79 L.Ed. 1314, 1321].)  Jackson contends here the prosecutor's reference to him being questioned in another similar crime "had a nuclear impact because it tended to confirm the picture of a serial rapist the prosecution was trying to paint at trial."
> Assuming the question by the prosecutor was misconduct, it was not irreparably prejudicial. As the trial court noted, the jury already knew Jackson was accused of being a serial rapist. Jackson stipulated to a prior conviction of assault with the intent to commit rape. Jackson was being tried in this case for kidnapping and rape of two victims in separate incidents. And contrary to Jackson's argument on appeal, the prosecution did not reference Jackson being questioned on another crime similar to those for which he was being tried. The prosecutor suggested the detective was asking Jackson about another unrelated matter, which the jury could have reasonably understood to be the traffic matters Jackson thought he had been brought in for questioning on.
> Moreover, the trial court promptly sustained the objection made by Jackson and gave the jury an admonition to disregard it. We "presume the jury heeded the admonition and that any error was cured." (*People v. Dickey* (2005) 35 Cal.4th 884, 914; see *People v. Millwee* (1998) 18 Cal.4th 96, 140.) As the trial court's corrective action cured any

---

[28]  3 RT 871-72.

[29]  3 RT 877.

harm, the trial court did not abuse its discretion in denying Jackson's motion for a mistrial. (*People v. Cox* [(2003)] 30 Cal.4th [916], 953- 954; *People v. Eckstrom* [(1986)] 187 Cal.App.3d [323], 330.)[30]

The Court of Appeal found that although the prosecutor misspoke regarding an "unrelated matter," the comment was not so prejudicial that it undermined the proceedings.  This Court can only grant Jackson relief if this conclusion constituted an unreasonable application of clearly-established federal law or involved an unreasonable determination of the facts.

The record suggests that, although the prosecutor improperly implied that the police were investigating Jackson for an unrelated incident, this did not deprive him of Due Process.  The prosecution had alleged that Jackson was a serial rapist–he was being tried for the kidnapping and rape of two separate victims, arising out of two separate incidents, which were being investigated by two separate detectives.  The prosecutor did not reference the nature of the "unrelated matter" and the jury could have likely inferred that Jackson was being questioned regarding the "traffic matters" that Jackson originally though he was going to be questioned on.  Alternatively, the jury could have concluded that the "unrelated matter" was actually the second assault with which Jackson was charged.  Finally, the judge assured the jury that the prosecutor did not mean to imply that Jackson was involved in other criminal matters not before them.  This Court must assume that the jury followed this instruction, in the absence of evidence to the contrary .[31]

---

[30]  Lodged Doc. 5, pp. 47-48.

[31] *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh,* 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *Francis v. Franklin*, 471 U.S. at 324 n. 9 (1985).

When viewed in the totality of the circumstances, this Court cannot say that the prosecutor's brief and vague reference to another incident in which Jackson may have been involved so undermined the trial that it deprived Jackson of Due Process.[32]  The Court of Appeal's opinion was not contrary to clearly established federal law.  Jackson is not entitled to relief on this ground.

<u>Direct Examination of Detective Joachim</u>

During his testimony, Jackson stated that he had been unfaithful to his wife for years and that he frequently used the services of neighborhood prostitutes during that time.  Jackson also admitted that he lied to Detective Joachim ("Joachim") during an investigative interview, when he initially denied knowing J.O. or O.T.  The prosecutor then cross-examined Jackson regarding the statements Jackson previously made to Joachim, which were inconsistent with his trial testimony.  At one point, the prosecutor asked Jackson what happened when Joachim mentioned there could be some DNA evidence in the case.  Defense counsel objected, claiming that the question violated Jackson's rights under *Miranda v. Arizona*,[33]–once the subject of DNA testing arose during Joachim's interview of Jackson, Jackson invoked his right to remain silent and any statements he subsequently made should be barred.  The trial court reviewed the videotape of Jackson's interrogation and agreed that Jackson had invoked his right to remain silent at that point, and thus all of Jackson's subsequent statements were inadmissible.[34]

---

[32]  *Davis*, 384 F.3d at 644 (quoting *Darden*, 477 U.S. at 181).

[33]  384 U.S. 436 (1966).

[34]  3 RT 886-887.

Once Jackson was done testifying, the prosecution recalled Joachim in order to further impeach Jackson's credibility.  Joachim testified that he advised Jackson of his *Miranda* rights, and Jackson initially agreed to waive them.  Joachim stated that when he informed Jackson that Jackson was accused of sexually assaulting a woman, Jackson expressed shock and disbelief. Jackson told Joachim that he was happily married and had a normal sex life.  Jackson told Joachim that he and his wife used condoms.  Jackson stated that he did not have sex with any other women during that period and denied visiting prostitutes.  Joachim testified that Jackson portrayed himself as the kind of man who is home every night with his wife and family.  When he was shown photos of J.O. and M.M., Jackson denied that they were ever in his car, and he denied having sex with either woman–he again claimed he was faithful to his wife.  The prosecutor continued to examine Joachim about his interview of Jackson:

> **Q:** Did [Jackson] tell you during your interview that his method of being unfaithful was going up and down Stockton Boulevard looking for prostitutes or girls that want to have fun?
> **A:** Again, I asked him if he had ever been with a prostitute since he'd been married, and he said he had not.
> **Q:** Did he tell you he used to get hand jobs from other people out there than his wife or have sex?
> **A:** He did not tell me about that.
> **Q:** This is something he did three or four times a week?
> **A:** No, he did not tell me.
> **Q:** For years?
> **A:** Nothing like that.
> **Q:** Even in L.A.?
> **A:** Nothing like that.
> **Q:** Did he tell you that lotion he had he used for sexual purposes in his car? There was lotion found in that car during the search warrant, were you aware?
> **A:** Yes, I am aware. I don't recall necessarily talking to him about the lotion, but he did not tell me the lotion was used for any sexual activity.
> **Q:** Did he tell you that those condoms were condoms he used for having sex with strangers, as opposed to his wife?
> **A:** No, ma'am. He said those condoms were just for safe, you know, birth control with sex with his wife.

20

**Q:** Did he tell you he hasn't had intercourse with his wife in nine years? Did he tell you that?
**A:** No, he did not.[35]

At the end of the evidence, the defense made a motion to dismiss based on the fact that several of the questions that the prosecutor posed to Joachim violated the Supreme Court's holding in *Doyle*. After reviewing Joachim's rebuttal testimony, the trial court determined that three questions posed by the prosecutor violated *Doyle* because they concerned subjects that were not addressed before Jackson invoked his right to remain silent and the prosecutor's questions called attention to Jackson's silence on these matters. However, the trial court also found that because Jackson provided direct testimony on each of these three subjects, the prejudice from the prosecutor's improper questions was "not so great that it [could not] be corrected by an admonition to the jury."[36] The court issued the following admonition:

> Ladies and gentlemen, you have now heard all the evidence in this case. I do want to give you one admonition before I give you the jury instructions. The admonition is as follows: A defendant has an absolute constitutional right to remain silent. A prosecutor is prohibited from using a defendant's exercise of this right for any purpose. The court has ruled that the prosecutor in this case has asked three questions during the examination of Detective Jocahim, which violate this constitutional                mandate.
> Question one refers to getting hand jobs from persons other than his wife. Question two refers to looking for sex outside his marriage three to four times a week. Question three refers to whether or not the defendant told the detective that he did not have sexual intercourse with his wife for nine years.
> The court is striking both the questions and the answers from the record. You must disregard the question and answer and must not consider either for any purpose. This applies only to those questions in regards to the People's rebuttal case of Detective Joachim.[37]

---

[35]  4 RT 937-38.

[36]  4 RT 1029.

[37]  4 RT 1040-41.

The Court of Appeal agreed that the *Doyle* violation was properly cured by the timely

admonition to the jury:

> The United States Supreme Court held in *Doyle*, *supra*, 426 U.S. 610 [49 L.Ed.2d
> 91], that once an accused has been given *Miranda* warnings, his or her postarrest silence
> may not be used to impeach an explanation subsequently offered at trial.  (*Doyle*, *supra*,
> at p. 619 [49 L.Ed.2d at p. 98].) Use of such silence violates due process under the
> Fourteenth Amendment because *Miranda* warnings carry an implicit assurance that the
> exercise of the right to be silent will carry no penalty. (*Doyle*, *supra*, at p. 618 [49
> L.Ed.2d at p. 98].)
>
> In order to establish a violation of due process under *Doyle*, the defendant must
> show two things: (1) "the prosecution ma[de] use of a defendant's postarrest silence for
> impeachment purposes" and (2) "the trial court permit[ted] that use." (*People v. Evans*
> (1994) 25 Cal.App.4th 358, 368; see *Greer v. Miller* (1987) 483 U.S. 756, 765-766 [97
> L.Ed.2d 618, 630-631]; see *People v. Champion* (2005) 134 Cal.App.4th 1440, 1448.)
> "[P]ermission . . . will usually take the form of overruling a defense objection, thus
> conveying to the jury the unmistakable impression that what the prosecution is doing is
> legitimate." (*People v. Evans*, *supra*, 25 Cal.App.4th 358, 368.)
>
> Far from giving the jury the impression that the prosecution's questioning of
> Detective Joachim regarding Jackson's silence regarding his sexless marriage and
> extramarital sex was legitimate, the trial court here informed the jury that such questions
> violated Jackson's constitutional rights. The court went on to strike both the questions
> and answers in Joachim's rebuttal testimony from the record, instructed the jury to
> disregard both the questions and answers, and instructed the jury not to consider either
> the questions or answers for any purpose.  The trial court clearly did not permit the
> prosecution to make use of Jackson's postarrest silence.  Therefore, Jackson has not
> shown any violation of due process under *Doyle*.[38]

The Court of Appeal found that although the prosecutor asked three improper questions,

they were not so prejudicial that they undermined the proceedings.  This Court can only grant

Jackson relief if this conclusion constituted an unreasonable application of *Doyle*, or involved an

unreasonable determination of the facts.  *Doyle* held that "it does not comport with due process

to permit the prosecution during the trial to call attention to his silence at the time of arrest and to

insist that because he did not speak about the facts of the case at that time, as he was told he need

---

[38] Lodged Doc. 5, pp. 52-53.

not do, an unfavorable inference might be drawn as to the truth of his trial testimony."[39]  In this case, the inquiries regarding what Jackson failed to tell Joachim violated *Doyle* because Jackson's contact with Joachim encompassed both pre-*Miranda* and post-*Miranda* periods.  By drawing attention to the fact that Jackson "never" mentioned details of his infidelities to Joachim, the prosecutor implicated Jackson's silence both pre-*Miranda* and post-*Miranda*.[40]

However, "[t]he Supreme Court has subsequently held in *Greer v. Miller*, 483 U.S. 756 [, 762], 107 S. Ct. 3102, 97 L.Ed.2d 618 (1987), that there is no *Doyle* violation if the district court promptly sustains a timely objection to a question concerning post arrest[, post-*Miranda* ] silence, instructs the jury to disregard the question, and gives a curative jury instruction"[41] which has the effect of barring the jury from considering the defendant's post-arrest silence.

In this case, defense counsel did not timely object to the three improper questions, but rather raised the issue in a motion to dismiss at the conclusion of the evidence.  The court reacted promptly and issued a curative admonition which told the jury to disregard the three questions and their answers.  Although defense counsel did not raise an objection in time to curtail the

---

[39] *Doyle*, 426 U.S. at 619.

[40] Before he invoked his *Miranda* rights, Jackson told Joachim that he was happily married, had a normal sex life and did not visit prostitutes.  These voluntary statements were admissible to impeach Jackson's credibility, since Jackson testified at trial that he and his wife did not have sex regularly and that he often visited prostitutes.  However, before Jackson invoked his *Miranda* rights he never informed Joachim of the nature of the sexual acts he engaged in with the prostitutes (hand-jobs) and how frequently he sought their services (three or four times a week).  Thus, it appears the prosecutor simply strayed too far in her attempt to elicit inconsistences in Jackson's statements to Joachim.  The record does not indicate that she intended to call attention to his silence so much as she wanted to highlight the inconsistencies between Jackson's interview with Joachim and his testimony.

[41] *United States v. Foster*, 985 F.2d 466, 468 (9th Cir. 1993), *as amended*, 995 F.2d 882 (9th Cir. 1993) and 17 F.3d 1256 (9th Cir. 1994).

improper inquiries, the record reflects that the prosecutor only asked three improper questions, did not directly call attention to Jackson's silence, and "the fact of [Jackson's] post-arrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference."[42]  Finally, the court struck the questions and answers from the record and admonished the jury.  Thus, this Court cannot conclude that the California Court of Appeal unreasonably applied the holdings of *Doyle* and *Greer* when it concluded that no *Doyle* error occurred.  Jackson has failed to show he is entitled to relief on this ground.

Even assuming, without finding, that a *Doyle* violation occurred, the error was harmless.[43]  The burden of proving a constitutional error harmless beyond a reasonable doubt rests upon the government.[44]  "When deciding whether a prosecutor's reference to a defendant's post-arrest silence was prejudicial, this court will consider the extent of comments made by the witness, whether an inference of guilt from silence was stressed to the jury, and the extent of other evidence suggesting defendant's guilt."[45]

As noted above, the prosecutor asked three questions which had the effect of calling attention to Jackson's silence.  However, the trial court struck the questions and admonished the jury, and the prosecutor did not stress an inference of guilt on the basis of Jackson's invocation

---

[42]  *Greer*, 483 U.S. at 764-765.

[43]  *United States v. Bushyhead*, 270 F.3d 905, 911 (9th Cir. 2001) ("If there was an improper comment on a defendant's silence at trial, violating the Fifth Amendment privilege against self-incrimination, we apply harmless error review.").

[44]  *United States v. Williams*, 435 F.3d 1148, 1162 (9th Cir. 2006).

[45]  *Bushyhead*, 270 F.3d at 913 (citation omitted).

of his Miranda rights.[46]  Thus, the prosecutor was not allowed to make use of a Jackson's post-*Miranda* silence at trial.[47]  Furthermore, the evidence of Jackson's guilt, which included DNA evidence linking him to the rapes and the identification of Jackson by both of the victims, was overwhelming.  Any *Doyle* error that might have occurred was clearly harmless.

Even in the absence of a *Doyle* violation, the prosecutor's "attempt[s] to violate the rule of *Doyle* by asking . . . improper question[s] in the presence of the jury" constitute prosecutorial misconduct, and that misconduct warrants reversal where it "may [have] so infec[ted] the trial with unfairness as to make the resulting conviction a denial of due process."[48]  Because the trial court sustained the *Doyle* objections, struck the three questions and answers, and admonished the jury not to consider the colloquy, the prosecutor's improper questions did not violate Jackson's due process rights.[49]

---

[46]  As noted in Footnote 36, it appears the prosecutor was trying to impeach Jackson's overall credibility by highlighting the fact that Jackson made statements to Joachim that were inconsistent with his testimony at trial, not call attention to his silence.

[47]  *Greer*, 483 U.S. at 763.

[48]  *Id.* at 765.

[49]  *See id.* at 766 (holding that there was no due process violation occasioned by the prosecutor's attempt to violate Doyle on closely analogous facts).

CONCLUSION AND ORDER

Jackson is not entitled to relief under any ground raised in the Petition.  Accordingly,

**IT IS HEREBY ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of

Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[50]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[51]

The Clerk of the Court is to enter judgment accordingly.

Dated: May 24, 2011.

_____/s/ James K. Singleton, Jr._____
**JAMES K. SINGLETON, JR.**
United States District Judge

---

[50]  28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) ("reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further" (internal quotation marks omitted)).

[51]  *See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.

26